IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

_____

No. 22-0378

_____

FILED
June 12, 2024
released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

BRIAN FRYE,
Plaintiff Below/Petitioner,

v.

ERIE INSURANCE COMPANY,
Defendant Below/Respondent.

_____

Appeal from the Circuit Court of Ohio County
The Honorable Jason A. Cuomo, Judge
Case No. 19-C-52

VACATED AND REMANDED

_____

Submitted: January 24, 2024
Filed: June 12, 2024

Richard A. Monahan, Esq.
James G. Bordas III, Esq.
Luca D. DiPiero, Esq.
BORDAS & BORDAS, PLLC
Wheeling, West Virginia
Counsel for Petitioner

Amy M. Smith, Esq.
STEPTOE & JOHNSON, PLLC
Bridgeport, West Virginia

Michelle Gaston, Esq.
STEPTOE & JOHNSON, PLLC
Wheeling, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

CHIEF JUSTICE ARMSTEAD dissents and reserves the right to file a dissenting Opinion.

JUSTICE HUTCHISON concurs and reserves the right to file a concurring Opinion.

JUSTICE WOOTON concurs in part and dissents in part and reserves the right to file a separate Opinion.

JUSTICE BUNN disqualified.

JUDGE ABRAHAM sitting by temporary assignment.

SYLLABUS BY THE COURT

1.      "The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed."  Syllabus Point 1, *Wickland v. American Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998).

2.      "A motion under Rule 59(e) of the *West Virginia Rules of Civil Procedure* should be granted where: (1) there is an intervening change in controlling law; (2) new evidence not previously available comes to light; (3) it becomes necessary to remedy a clear error of law or (4) to prevent obvious injustice."  Syllabus Point 2, *Mey v. Pep Boys-Manny, Moe & Jack*, 228 W. Va. 48, 717 S.E.2d 235 (2011).

WALKER, Justice:

Brian Frye contends that his home has suffered damage due to underground mine subsidence. He submitted a claim to his home insurer, Respondent Erie Insurance, Co. and notified the Board of Risk Insurance and Management of the damages. Erie and BRIM investigated Mr. Frye's claim. Erie denied the claim, and BRIM later informed Mr. Frye that the damage to his property was not due to mine subsidence. Mr. Frye then sued Erie for breach of contract, among other claims. The circuit court granted summary judgment to Erie, concluding that Erie functioned as BRIM's agent in the adjustment of Mr. Frye's claim. Mr. Frye next moved the circuit court to alter or amend that judgment, arguing that it threatened the constitutionality of article 30 ("Mine Subsidence Insurance"), chapter 33 of the West Virginia Code. In so doing, Mr. Frye presented arguments to the circuit court that drew into question the constitutionality of statutes affecting the public interest of West Virginia, so that, under West Virginia Rule of Civil Procedure 24(c) and circumstances present, here, the circuit court was obliged to "give notice thereof to the attorney general of this State." That did not occur. So, in these particular circumstances, we now vacate the order denying Mr. Frye's Rule 59(e) motion and remand this matter to the circuit court for further proceedings as described, below.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. Frye owns a home in Ohio County, West Virginia. He came to believe that his house, garage, and property had been damaged by underground mine subsidence.

1

So, on November 21, 2017, Mr. Frye's counsel submitted a claim against Mr. Frye's homeowner's insurance policy, issued by Erie Insurance, Co.

Mr. Frye's counsel also notified the Board of Risk and Insurance Management[1] the same day. BRIM responded that Erie, and not BRIM, insured the Frye property, so that any damages related to mine subsidence would be paid by Erie, not BRIM. Yet, as BRIM acknowledged, it "does play a role in the mine subsidence claim process . . . basically . . . as a reinsurer for Erie[.]" BRIM also advised Mr. Frye that its "role can be found at" article 30, chapter 33 of the West Virginia Code and attendant legislative rules. BRIM directed Mr. Frye to "submit [his] claim to Erie" so that Erie could then "present it to [BRIM] with documentation" of Mr. Frye's mine subsidence coverage. BRIM represented that Mr. Frye's letter would be "place[d] with the claim information when received from Erie."

Erie sent Mr. Frye's counsel a reservation of rights letter on December 7, 2017. Five days later, Erie advised Mr. Frye's counsel that it had "submitted an assignment

---

[1] BRIM is a creature of statute, *see* W. Va. Code § 29-12-3 (2001), and is tasked with "general supervision and control over the insurance of state property, activities and responsibilities . . . ." *Id*. § 29-12-5(a)(1) (2024).

to BRIM to investigation [sic] the cause of the loss to the insured property." BRIM engaged Irvine & Associates, Inc. to investigate Mr. Frye's claim.

On January 19, 2018, engineer Richard A. Bragg (unaffiliated with Irvine & Associates) inspected Mr. Frye's property at Erie's behest. Mr. Frye and his lawyer were present. In a report dated February 5, 2018, Mr. Bragg concluded that the damage observed at Mr. Frye's property was not consistent with mine subsidence and other causes were more plausible. The engineer later elaborated on what those other causes were—for example, settlement and frost heave. Mr. Frye was not given a copy of Mr. Bragg's report until October 2018. Erie did, however, send Mr. Frye numerous status letters between January 3 and September 24, 2018, informing him that his claim was open and that the mine subsidence investigation was pending.

Also on January 19, 2018, Irvine & Associates contacted Mr. Frye's attorney to schedule an inspection independent of the one performed by Mr. Bragg. On March 26, 2018, engineer Robert L. Bloomberg inspected Mr. Frye's property at Irvine & Associate's request (acting on behalf of BRIM). Mr. Frye's lawyer accompanied Mr. Bloomberg throughout the inspection. Mr. Bloomberg authored a report dated October 12, 2018, in which he also concluded that Mr. Frye's property had not been damaged by mine subsidence. Irvine & Associates emailed that report to Mr. Frye's counsel the same day and invited Mr. Frye's counsel to submit any additional claim documentation within thirty

3

days. Based on email correspondence between Irvine & Associates and BRIM, it appears that Mr. Frye's lawyer did not respond to the October 12 email.

On October 19, 2018, Erie sent Mr. Frye's counsel a letter denying insurance coverage:

> [Erie] has completed our investigation into the property damage loss which included a personal inspection and two engineer inspections from Romauldi, Davidson, & Associates and Bloomberg Consulting Engineer. Our investigation has determined that the damages to the insured property were not caused by mine subsidence, but were caused by wear and tear and deterioration, maintenance and earth movements. A review of the language in the Extracover Policy specifically excludes coverage for each of these causes of loss.

On February 27, 2019, BRIM notified Mr. Frye and counsel that it had determined that damage to the Frye home was "not the result of collapse of an underground mine." The letter also mentioned the prior communications with Mr. Frye's lawyer:

> The report of our consulting engineer is attached [i.e., the Bloomberg report]. This is the same report which our adjusters, Irvine and Associates, first forwarded to your attorneys . . . on October 12, 2018. Since that time, we have been waiting to see if you or your attorney would present any contrary or additional evidence to dispute the report. A second copy of the report was sent to [your counsel] on January 22, 2019. To date, we have received no response taking issue with our findings.

4

On February 21, 2019, Mr. Frye filed a lawsuit against Erie for breach of the insurance contract and common law and statutory bad faith. Erie moved for judgment on the pleadings in June 2021, arguing that under article 30, chapter 33 of the West Virginia Code and § 115-1-4 of the West Virginia Code of State Rules, BRIM had the exclusive authority to adjust Mr. Frye's claim for damages arising from mine subsidence, so that it could not be said to have breached the insurance contract when Mr. Frye's claim was denied. As to Mr. Frye's common law and statutory bad faith claims, Erie argued that it could not be subject to those claims absent a breach of the insurance contract. Mr. Frye responded that BRIM's "participation in the mine subsidence investigation did not absolve Erie from complying with its obligations as [Mr. Frye's] insurer"—in other words, that an insurer may not delegate the duties it owes to the insured to another party—and that his bad faith claims were independent of his claim against Erie for breaching the insurance contract.

The court denied Erie's motion in July 2021, concluding that,

> BRIM's role does not nullify Erie's obligation to its insured to reasonably investigate all claims arising under its homeowners insurance policies such that would render any breach of contract claim legally inoperative. Plaintiff has adequately set forth factual allegations supporting viable claims for breach of contract as well as common law and statutory bad faith.

Following additional discovery, Erie moved for summary judgment in February 2022, reiterating its earlier arguments. Erie also argued that Mr. Frye had not

5

offered evidence to establish that Erie engaged in pattern or practice of claims handling that violated the Unfair Trade Practice Act, West Virginia Code §§ 33-11-1 to 10 (UTPA). Mr. Frye responded with arguments similar to those in the earlier round of briefing. Regarding his UTPA claim, Mr. Frye argued that certain discovery responses tended to show that Erie had committed multiple violations of that statute in its handling of his claim, and so preserved a genuine issue of material fact for trial. The court heard argument on Erie's motion for summary judgment during the February 2022 pre-trial conference.

The court entered an order granting Erie's motion for summary judgment on March 3, 2022. Relying on West Virginia Code § 33-30-8 (2016),[2] West Virginia Code of State Rules § 115-1-4.1,[3] *Higginbotham v. Clark*,[4] and a recent decision by the United States District Court of the Northern District of West Virginia,[5] the court concluded that,

---

[2] W. Va. Code § 33-30-8 (2016) (in part) (BRIM "is authorized to undertake adjustment of losses and administer the fund, or it may provide in a reinsurance agreement that the insurer do so.").

[3] W. Va. R. Code § 115-1-4.1 (eff. Aug. 1, 2021) ("All mine subsidence claims shall be reported to the Board for assignment to qualified independent adjusting firms in accordance with claim procedures as outlined on Appendix D. The selected adjusting firm will send all reports simultaneously to the insurer and the Board *with all settlement authority, coverage questions and related matters being resolved by the Board*.") (emphasis added).

[4] 189 W. Va. 504, 432 S.E.2d 774 (1993).

[5] *Patterson v. Westfield Ins. Co.*, 516 F.Supp.3d 557 (N.D. W. Va. 2021).

[a]bsent (1) fraud, (2) any wrongful conduct occurring between the time of receiving notice of a mine subsidence claim and transferring the claim to BRIM (e.g., delay in transferring the case to BRIM), and/or (3) any wrongful handling of claims *other than* mine subsidence, an action for breach of contract may not be maintained against insurer [sic.] per W. Va. Code § 33-30-1 *et seq.* and the regulations enacted pursuant thereto. In this case, because [Mr. Frye] has presented insufficient evidence which would create genuine issues of material fact for a jury to decide on any of the above three scenarios, [Mr. Frye's] breach of contract claims, as well as his extra contractual claims . . . must be dismissed.

The court entered a final judgment order on March 29, 2022. The next day, Mr. Frye filed a motion under West Virginia Rule of Civil Procedure 59(e) to alter or amend the judgment.[6] There, Mr. Frye argued that the court clearly erred as a matter of law when it granted summary judgment to Erie because it (1) did not address whether BRIM's role in mine subsidence claims violates various provisions of the West Virginia Constitution, and (2) concluded that the BRIM statutes and related regulations expressly prohibit an insured from bringing claims against his insurer in the context of mine subsidence claims. Erie responded that Mr. Frye's constitutional argument was a "red herring," considering the "vast evidence of no mine subsidence," at Mr. Frye's property.

---

[6] W. Va. R. Civ. P. 59(e) (1998) ("Any motion to alter or amend the judgment shall be filed not later than 10 days after entry of the judgment."). This Court has adopted amendments to the West Virginia Rules of Civil Procedure, effective January 1, 2025. Amended Rule 59(e) states, "[a] motion to alter or amend a judgment shall be filed no later than 28 days after the entry of the judgment."

7

Erie also argued that Mr. Frye could not use Rule 59(e) to introduce a new legal argument and that he had waived that constitutional argument by failing to alert the Attorney General of the matter, as required under West Virginia Rule of Civil Procedure 24(c).

The circuit court denied Mr. Frye's Rule 59(e) motion on April 18, 2022. The court refused to rule on Mr. Frye's constitutional argument because "it was not plead [sic.] in [the complaint] nor argued in [his] *Motion for Summary Judgment* briefings." The court then concluded that Mr. Frye's constitutional argument was moot because he had not raised a genuine issue of material fact in response to Erie's motion for summary judgment. Regarding Mr. Frye's second argument, the court determined that he had misunderstood its ruling at summary judgment. The court reiterated that an insured may sue his insurer on the mine subsidence endorsement of his homeowner's insurance in certain circumstances—fraud, delay in assigning the claim to BRIM, or wrongful handling of claims *other than* loss due to mine subsidence. The court also concluded that, as it had "found in its [o]rder, [Mr. Frye] presented no genuine issues of material fact for a jury to resolve, and no reasonable jury could have concluded based upon those facts, that [Mr. Frye's] home sustained damage from mine subsidence." Mr. Frye now appeals.

## II. STANDARD OF REVIEW

"The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that

8

would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed."[7] Mr. Frye's Rule 59(e) motion is based on the summary judgment awarded to Erie, so we review de novo Mr. Frye's Rule 59(e) motion.[8] A Rule 59(e) motion is properly granted where "(1) there is an intervening change in controlling law; (2) new evidence not previously available comes to light; (3) it becomes necessary to remedy a clear error of law or (4) to prevent obvious injustice."[9] While "[a] Rule 59(e) motion may be used to correct manifest errors of law or fact, or to present newly discovered evidence," it "is not appropriate for presenting new legal arguments, factual contentions, or claims that could have previously been argued."[10]

### III. ANALYSIS

Mr. Frye assigns three errors to the circuit court's denial of his Rule 59(e) motion. First, he argues that the circuit court committed a clear error of law affecting substantial justice when it declined to address the constitutionality of article 30, chapter 33

---

[7] Syl. Pt. 1, *Wickland v. Am. Travellers Life Ins. Co.*, 204 W. Va. 430, 513 S.E.2d 657 (1998).

[8] *See* Syl. Pt. 1, *Painter v. Peavy*, 192 W. Va. 189, 451 S.E.2d 755 (1994) ("A circuit court's entry of summary judgment is reviewed *de novo*.").

[9] Syl. Pt. 2, *Mey v. Pep Boys-Manny, Moe & Jack*, 228 W. Va. 48, 717 S.E.2d 235 (2011).

[10] *Id*. at 56, 717 S.E.2d at 243.

of the West Virginia Code and when it "fail[ed] to interpret [those statutes] in a manner that does not deprive [him] (and others similarly situated) of his constitutional rights to a remedy, due process, and equal protection of the law."  Mr. Frye also contends that the circuit court committed clear legal error by denying his Rule 59(e) motion on the grounds that he had not raised a genuine issue of material fact as to whether the damage to his property was due to mine subsidence, when the court had not made that finding in its order granting summary judgment to Erie.  Finally, Mr. Frye asserts that, even if the court had made such a ruling at summary judgment, he adduced sufficient evidence of property damage due to mine subsidence to withstand Erie's motion for summary judgment.  Before addressing Mr. Frye's first (and determinative) assignment of error, we provide a short summary of article 30, chapter 33 of the West Virginia Code and our sole decision addressing those statutes, *Higginbotham v. Clark*.

The Legislature enacted article 30 ("Mine Subsidence Insurance") of chapter 33 in 1982.  In broad strokes, the legislation "provided that mine subsidence insurance coverage would be made available to all state residents through the State Board of Risk and Insurance Management [BRIM], which serves in an administrative capacity as the Manager and Trustee of the West Virginia Mine Subsidence Fund."[11]  The Legislature

---

[11] *Higginbotham*, 189 W. Va. at 505–06, 432 S.E.2d at 775–76 (internal notes omitted).

explained that it intended article 30 to respond to—in fact, alleviate—the "great loss of home, shelter and property" caused by mine subsidence, along with the detriment that loss caused to West Virginians' health, safety and welfare.[12]

We have explained that,

> [u]nder W.Va.Code, 33–30–1, *et seq.,* a rather complex bureaucratic system exists to ensure that eligible insureds receive mine subsidence coverage. The system works as follows: (1) the statute mandates that mine subsidence coverage be granted to all eligible insureds unless they affirmatively waive such coverage; (2) the insured pays a mine subsidence coverage premium to the insurer; (3) the insurer then forwards the premium, minus a "ceding commission," to [BRIM]; (4) [BRIM] "is authorized to undertake adjustment of losses and administer the fund" under W.Va.Code, 33–30–8; and (5) whenever a mine subsidence claim is submitted to an insurer, it must "be reported to [BRIM] for assignment to qualified independent adjusting firms.... The selected adjusting firm will send all reports simultaneously to the insurer and the Board *with all settlement authority, coverage questions and related matters being resolved by the Board.*" 8 W.Va.C.S.R. § 115–1–4.1.[13]

---

[12] W. Va. Code § 33-30-1 (1982).

[13] *Higginbotham*, 189 W. Va. at 513–14, 432 S.E.2d at 783–84 (Miller, J. concurring) (internal notes omitted) (emphasis in original).

We have also explained that § 115-1-4.1 "makes it clear that the insurer acts merely as an agent of the State and is bound by the Board's decisions, because 'all settlement authority, coverage questions and related matters' are to be resolved by the Board."[14]

In *Higginbotham*, we indicated that BRIM's authority over the adjustment of mine subsidence claims conflicted with its nominal status as the "reinsurer" of insurers such as Erie, resulting in confusion as to "what recourse an insured has if aggrieved by a [BRIM] decision."[15] We observed in that case that, "[w]here a typical reinsurance contract is involved, 'there is no privity ... between the original insured and the reinsurer; as a result, it is generally recognized that the original insured cannot recover directly from the reinsurer."[16] Yet, we saw that BRIM's "mine subsidence arrangement with insurers . . . is not a traditional reinsurance agreement," apparently because, again, under article 30, chapter 33 and BRIM's legislative rules, "the insurer acts merely as an agent of the State and is bound by [BRIM's] decisions . . . ."[17] For that reason, in *Higginbotham*, we stated "it is necessary for [BRIM] to set forth in its regulations some procedural guidelines

---

[14] *Id*. at 510, 432 S.E.2d at 780 (quoting W. Va. C.S.R. § 115-1-4.1).

[15] *Id*.

[16] *Id*. (quoting Allan D. Windt, *Insurance Claims and Disputes* § 7.10 (2d ed.1998)).

[17] *Id*.

applicable to this variation on the reinsurance contract," lest "[f]undamental principles of due process" be implicated.[18]

*Higginbotham* is problematic for both Erie and Mr. Frye, as the briefing to the circuit court demonstrates. In its motion for summary judgment, Erie stressed the statement in *Higginbotham* that, under § 115-1-4.1, insurers such as Erie function as agents

_____

[18] *Id.*; *see also id.* at 515, 432 S.E.2d at 785 (Miller, J., concurring) ("I agree with the majority that the appellant's constitutional right to due process has not been met in this case and a remand is therefore necessary.").

At the pretrial conference, both parties represented to the circuit court that, to their knowledge, Mr. Frye did not have an administrative remedy for the allegedly erroneous claims decision. Later, during briefing to this Court, Erie pointed to Appendix A to West Virginia Code of State Rules § 115-1-3.4—the form, mine subsidence coverage insurers must issue, and which includes an arbitration provision. That provision begins as follows:

> In the event that the Insured and the Company, through [BRIM], as called for by the statute, are unable to reach an agreement as to: (1) whether the insured STRUCTURE has sustained damage . . . during the effective policy dates, due to COAL MINE SUBSIDENCE . . . then either the Insured or BRIM may request that such issue(s) in dispute will be submitted to binding arbitration. . . . At such time as the parties have mutually indicated their written consent to binding arbitration of the issue(s) in dispute, the arbitration process shall thereby commence . . . .

According to Erie, because "the regulations provide a remedy of arbitration against BRIM that Mr. Frye has failed to acknowledge, . . . the [c]ircuit [c]ourt properly declined to address a facial challenge to" article 30, chapter 33. It appears that Erie did not raise this argument to the circuit court in response to Mr. Frye's Rule 59(e) motion. For that reason, we decline to address it.

13

of BRIM and are bound by its decisions. Mr. Frye refused to engage with Erie on that argument, electing to focus on the theory that Erie—with whom he was in contractual privity—could not delegate its duties under the insurance contract to BRIM. Notably, Mr. Frye did not once cite *Higginbotham* in his response to Erie's brief in support of its motion for summary judgment. Yet, that case became the backbone of his argument in his Rule 59(e) motion: that the circuit court's summary judgment ruling jeopardized the constitutionality of article 30, chapter 33 by depriving him of the only possible avenue to challenge BRIM's coverage decision, and that to save the statutes,[19] the court had to allow his breach of contract claim against Erie to proceed.

Erie did not respond to that argument, substantively. Instead, it argued, first, that Mr. Frye could not raise a new legal argument via Rule 59(e) and, second, that he had waived the issue by not notifying the Attorney General of the matter under West Virginia Rule of Civil Procedure 24(c). On the first point, Mr. Frye replied to Erie, below, and now argues on appeal, that the constitutional arguments he pressed in his Rule 59(e) motion

---

[19] *See* Syl. Pt. 1, in part, *State ex rel. Appalachian Power Co. v. Gainer*, 149 W. Va. 740, 143 S.E.2d 351 (1965) ("Every reasonable construction must be resorted to by the courts in order to sustain constitutionality, and any reasonable doubt must be resolved in favor of the constitutionality of the legislative enactment in question.").

14

were not new. Rather, according to Mr. Frye, they were discussed at length during the pretrial conference. After a careful review of the transcript of that hearing, we agree.

Numerous times during the pretrial hearing, the circuit court's questions and comments and the parties' arguments dovetailed with *Higginbotham*; article 30, chapter 33; § 115-1-4.1; and the availability of remedies and process to the insured. For example, the court discussed West Virginia Code § 33-30-8 and BRIM's legislative rules:

> Now, in 33-30-8, I don't agree that it clearly says that the board is the only – is the exclusive agency with which to adjust claims. . . . But then you look at the regs enacted pursuant to that, it's clear that that's what they want to happen, to me. And I think that's nuts. For as nuts as that is, to me it makes the insurer immune, which nobody has really spelled out and the Supreme Court has said it explicitly, but --

Later, in response to Mr. Frye's counsel's statement that Erie could not delegate its duty to Mr. Frye to BRIM, the circuit court commented, that, "by that statement, to me it sounds almost like a constitutional argument, is what you're arguing, that the legislature could not authorize by statute a delegation, constitutionally, of an insurer's duty of fair dealing with its insured, by handing some adjustment over to a separate outfit like BRIM." The court and counsel for Mr. Frye later engaged in this colloquy:

> THE [CIRCUIT] COURT: But my response is potentially it's bad faith if – and again, I'm throwing this word out loosely – [Erie is] not immune in a mine subsidence case. The way I'm reading this potentially is – and I'm not making

15

this finding yet – once a claim is made under mine subsidence and [the insurer] refer[s] it to BRIM, I don't think [Erie has] has a duty to keep you informed of squat, potentially, as unfair as that may seem.

[Counsel for Mr. Frye]: Well, and that comes to my third point, which is if the law is to be interpreted that way, then you have a whole bunch of West Virginians with no remedy.

[Counsel for Mr. Frye]: I agree.

[Counsel for Mr. Frye]: And that's a problem. That's clearly not what was intended by the statute is that, look, you know, hey, you can go purchase mine subsidence coverage all you want, and BRIM –

THE [CIRCUIT] COURT: Can do whatever it wants and you're screwed.

[Counsel for Mr. Frye]: Yeah, BRIM can do whatever it wants and you got no remedy.

THE [CIRCUIT] COURT: Even in first party. It seems completely crazy to me, which goes back to my constitutional suggestion. Are you actually maybe suggesting that the manner in which this was written is unconstitutional, which is why I think [counsel for Erie] is saying, hey, let's pull the reins in here, I'm not arguing complete immunity, I'm trying to pin all this down and keep the argument much more sustainable on appeal that what you guys are maybe throwing out.

The court and Mr. Frye's counsel engaged in a similar discussion in the

context of Mr. Frye's breach of contract claim:

[Counsel for Mr. Frye]: But the breach of contract claim, the only thing my client can do is file a claim for those benefits with Erie. They can't file it with the [S]tate. File it with Erie, and if those aren't paid, file a breach of contract

16

claim. And that's the initial thing here, which is that my client still hasn't been paid his benefits or had an opportunity to be heard. And we have an expert to testify –

THE [CIRCUIT] COURT: Which is why this is about immunity. You guys can couch it any way you want, this is about immunity. The argument is the same for both. There is no breach of contract claim . . . if they have no duty to adjust and investigate and make a decision on whether the claim is valid.

. . . .

[Counsel for Mr. Frye]: But a contractual relationship says, hey, you pay this, I'll do this in exchange. And the contract was you pay premiums, you have mine subsidence, we'll pay you the benefits.

THE [CIRCUIT] COURT: If it's covered, yeah.

[Counsel for Mr. Frye]: If it's covered. But this is my client's only mechanism for determining whether that's covered. My client didn't get to have a hearing in front of BRIM or present anything in front of BRIM. And my client has no contract with BRIM.

Finally, the parties and the circuit court discussed whether a certified question ought to be submitted to this Court. The circuit court indicated that that course might be appropriate and outlined this question: "is an insurer in West Virginia immune from breach of contract and/or – and this is a big umbrella – bad faith, that would encompass UTPA, substantially prevail, all that stuff, in a mine subsidence case, absent fraud or a delay in the transfer of the claim to BRIM." Counsel for Mr. Frye later raised this scenario:

17

[Counsel for Mr. Frye]: I think also I guess perhaps secondarily with the Supreme Court would be is there a remedy under 33 or whatever the statute is for a West Virginia resident who's –

THE [CIRCUIT] COURT: Alleging breach of contract and bad faith.

[Counsel for Mr. Frye]: Or is there any remedy at all with respect to if a determination is made by BRIM that –

THE [CIRCUIT] COURT: Denial of mine subsidence.

[Counsel for Mr. Frye]: Yeah. Is there a remedy at all.

THE [CIRCUIT] COURT: And nobody here seems to think there's an administrative appeal process.

In *Higginbotham*, we did not consider the discrete question posed by Erie to the circuit court at summary judgment: whether an insured aggrieved by a BRIM decision may vindicate his claimed rights under the mine subsidence insurance contract by suing his insurer for breaching that contract. Regardless, the majority opinion in *Higginbotham* made clear that the issue left unaddressed, there—"what recourse an insured has if aggrieved by a Board of Risk decision"—may implicate constitutional questions. The exchanges quoted above demonstrate that the parties and the lower court recognized those questions *before* the circuit court decided Erie's motion for summary judgment. But we do not see that Mr. Frye could have expressly argued these questions until after the circuit court granted Erie's motion for summary judgment; before that moment, an avenue of

18

redress remained open to Mr. Frye—the breach of contract claim against his insurer—and the constitutional questions forecasted in *Higginbotham* were academic.[20]

This brings us to West Virginia Rule of Civil Procedure 24(c), which, in pertinent part, provides that, "[w]hen the constitutionality of a statute of this State affecting the public interest is drawn in question in any action to which this State or an officer, agency, or employee thereof is not a party, the court shall give notice thereof to the attorney general of this State."[21] Before the circuit court, Erie argued that Mr. Frye had waived his constitutional arguments by failing to notify the Attorney General of this matter, as required by Rule 24(c). Mr. Frye replied that he had not waived the arguments, distinguished Erie's authority,[22] and stated that he would not object to any additional delay

---

[20] Recall that, in denying Erie's motion for judgment on the pleadings, the circuit court had concluded that "BRIM's role does not nullify Erie's obligation to its insured to reasonably investigate *all claims* arising under its homeowners insurance policies such that would render any breach of contract claim legally inoperative." (Emphasis added).

[21] This Court adopted various amendments to the West Virginia Rules of Civil Procedure, effective January 1, 2025. The language quoted above remains in amended Rule 24. Effective January 2, 2025, it appears in new subsection (d).

[22] *See, e.g.*, *Petition of City of Clairton for Ct. Approval of Additional One-Half Percent Gen. Purpose Earned Income Tax*, 590 A.2d 838, 840 (Pa. Commw. Ct. 1991) (appellants waived arguments regarding constitutionality of statute where they failed to notify the attorney general as required under Pennsylvania rules of civil and appellate procedure).

that might be caused if the circuit court followed that rule's mandate and notified the Attorney General of the constitutional questions raised in the Rule 59(e) motion.

On appeal, Mr. Frye restates his position that Rule 24(c) did not—and does not—operate to bar his constitutional arguments. Erie does not now appear to argue that Mr. Frye's failure to provide notice to the attorney general waives those constitutional arguments, as Erie acknowledges, "the burden in Rule 24(c) to give notice to the Attorney General is placed on the court . . . ." Rather, Erie argues that

> [i]f Mr. Frye desired a ruling on a constitutional issue, he should have briefed the issue at some point before the [c]ircuit [c]ourt ruled on the summary judgment motion and requested the [c]ircuit [c]ourt to notify the Attorney General so that his office could seek intervention to defend the statutory scheme.

Given the current language of Rule 24(c), and the preceding discussion of the development of this case, we do not agree with Erie's argument and instead conclude that the Attorney General was due notice of this action.[23] Again, under Rule 24(c), "[w]hen

---

[23] *See, e.g.*, *In re Adoption of E.N.R.*, 42 S.W.3d 26, 33 (Tenn. 2001) (under Tennessee Rule of Civil Procedure 24.04, the trial court functions as a "gatekeeper to inquire whether notice has been provided to the Attorney General by the challenger and to suspend proceeding on the constitutional challenge until such notice has been provided and a response from the Attorney General received"); Tenn. R. Civ. P. 24.04 ("When the validity of a statute of this state or an administrative rule or regulation of this state is drawn in question in any action to which the State or an officer or agency is not a party, the court shall require that notice be given the Attorney General, specifying the pertinent statute, rule or regulation."); *see also Shelby Cnty. v. Delinq. Taxpayers 2018*, No. W2023-00446-

20

COA-R3-CV, 2024 WL 1944737, at \*4 (Tenn. Ct. App. May 3, 2024) (after appellate court ascertained that notice of constitutional question had not been provided to the attorney general, directing that, on remand, "the trial court must also consider the applicability of Tennessee Rule of Civil Procedure 24.04").

The dissent emphasizes the following passage from *In re E.N.R.*:

> The record shows that the constitutional challenge in this case was late-raised, minimally addressed, characterized by counsel as mentioned only for the purpose of preserving it for appeal, and perhaps was simply a last ditch effort to overcome the court's preliminary findings in favor of the opposition. To now rely upon the importance of this issue as grounds for appellate review is near hypocrisy given the short shrift it received at trial where it could have, and should have, been fully adjudicated.

Dissent at 10 (quoting *In re Adoption of E.N.R.*, 42 S.W.3d at 32). But that passage is not part of the Tennessee court's analysis of Rule 24.04 of the Tennessee Rules of Civil Procedure. Rather, it is part of the court's consideration of *the separate issue* of whether the appellant had waived his constitutional argument. *See id*. at 29−33; *see also Miltier v. Bank of Am., N.A.*, No. E2010-00537-COA-R3CV, 2011 WL 1166746, at \*4 (Tenn. Ct. App. Mar. 30, 2011) (constitutional challenge waived where argument raised for the first time on appeal); *Yebuah v. Ctr. for Urological Treatment, PLC*, No. M2018-01652-COA-R3-CV, 2020 WL 2781586, at \*4 (Tenn. Ct. App. May 28, 2020), rev'd on other grounds, 624 S.W.3d 481 (Tenn. 2021) (reversing trial court's ruling that appellants had waived their constitutional argument).

In the portion of *In re Adoption of E.N.R.* devoted to Rule 24.04, the issue is whether the trial court committed reversible error when it did not, pursuant to that rule, "ensure that notice of the constitutional challenge ha[d] been provided to the Office of the Attorney General." *In re Adoption of E.N.R.*, 42 S.W.2d at 33. The Supreme Court of Tennessee concluded that the trial court had not committed reversible error in the circumstances of that case because it was "*unreasonable* to expect a trial court to suspend a proceeding upon the untimely mention by counsel that a statute is unconstitutional," *id*. (emphasis added), that is, one made tepidly during closing argument and for the express purpose of preserving the matter on appeal rather than obtaining a substantive ruling by the trial court. The present circumstances are not comparable. As explained above, Mr. Frye was ill-positioned to raise these constitutional questions until the circuit court entered judgment in

21

the constitutionality of a statute of this State affecting the public interest is drawn in question in any action to which this State or an officer, agency, or employee thereof is not a party, the court shall give notice thereof to the attorney general of this State." There can be no dispute that article 30, chapter 33 of the West Virginia Code affects the public interest; the Legislature enacted those statutes to remedy the "great loss of home, shelter and property" caused by mine subsidence, along with the "detriment" which that loss caused to West Virginians' "safety, health and welfare."[24] Neither the State, nor a State officer, agency, or employee is a party to this litigation—there is one plaintiff (Mr. Frye) and one defendant (Erie). The circuit court was alerted to Rule 24(c) in the course of briefing on Mr. Frye's Rule 59(e) motion, and Mr. Frye indicated his willingness to accept any delay that may follow from notice pursuant to Rule 24(c). For those reasons, we conclude that the circuit court erred by failing to notify the Attorney General of this matter once Mr. Frye moved to alter or amend the summary judgment order on the grounds that the ruling, there, endangered the constitutionality of article 30, chapter 33 of the West Virginia Code.[25] On balance, we conclude that the appropriate remedy in these unique

---

Erie's favor on his breach of contract claim. *See supra*, n. 20. Further, the circuit court was made aware of Rule 24(c) and Mr. Frye's willingness to accede to any delay that may accrue while notice was given to the Attorney General.

[24] W. Va. Code § 33-30-1.

[25] *See also* W. Va. Code § 55-13-11 (1941) (providing that, "[i]n any proceeding [in which declaratory relief is sought, and] which involves the validity of a municipal ordinance or franchise, such municipality shall be made a party, and shall be entitled to be

circumstances is to (1) vacate the circuit court's order of April 18, 2022, denying Mr. Frye's Rule 59(e) motion[26] and (2) remand the matter to permit the circuit court to notify the Attorney General of these proceedings in accordance with Rule 24(c). Regardless of whether the Attorney General seeks permission to intervene in the proceedings on remand,[27] the court may undertake any additional proceedings it deems necessary to resolve Mr. Frye's pending motion to alter or amend the summary judgment order.

---

heard, and if the statute, ordinance or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the proceeding and be entitled to be heard").

[26] *See Oklahoma ex rel Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (stating that "[w]hen the parties and the court statutorily charged with notifying the Attorney General of a constitutional challenge to a federal statute fail to do so, the appellate court has discretion to respond in different ways, depending on the nature of the arguments and the progress of the litigation").

[27] *See* W. Va. R. Civ. P. 24(b) ("When a party to an action relies for ground of claim or defense upon any statute or executive order administered by a federal or State governmental officer or agency or upon any regulation, order, requirement, or agreement issued or made pursuant to the statute or executive order, the officer or agency upon timely application may be permitted to intervene in the action."). Rule 24(b) is amended effective January 1, 2025. As amended, subsection (b)(2) provides in pertinent part that,

> (2) *By a government officer or agency.* On timely motion, the court may permit a federal or state governmental officer or agency to intervene if a party's claim or defense is based on:
>
> (A) a statute or executive order administered by the officer or agency; or

23

VACATED AND REMANDED.

---

(B) any regulation, order, requirement, or agreement issued or made under the statute or executive order.